IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROSEMARIE LINDSEY,
    **Plaintiff,**

   **v.**

ST. MARY MEDICAL CENTER,
    **Defendant.**

CIVIL ACTION

NO.  14-4265

## OPINION

This action arises out of Plaintiff Rosemary Lindsey's termination from her employment at St. Mary Medical Center [SMMC] following a period in which she took leave under the Family Medical Leave Act ("FMLA") for a back injury, returned to work in a different positon but was terminated after she reinjured her back.  Plaintiff alleges claims for discrimination and retaliation under the Americans with Disabilities Act ("ADA"), the Pennsylvania Human Relations Act ("PHRA"), and the Family and Medical Leave Act ("FMLA").  Before the Court is SMMC's Motion for Summary Judgment.

## I. BACKGROUND

Plaintiff Rosemarie Lindsey was employed at SMMC as an Ultrasound Vascular Technician from November 2001 until April 2013.  As such, on a typical day, she would normally perform fifteen to twenty-five ultrasound scans.  JA 74, 100, 107.  The pace in the Ultrasound Department was "busy" and Plaintiff's work was physically demanding.  JA 111, 113.  In particular, her job involved continuous typing, occasional lifting; prolonged standing and bending; bending and squatting, twisting, and constantly engaging in repetitive leg and arm movements.  *See* JA 113-14.  Plaintiff frequently lifted up to ten pounds, pushed greater than 100 pounds, and pulled 50-100 pounds.  *Id.*

Plaintiff reported to Jim Watson, lead ultrasound technician, and Matt Maurizi, manager of Radiology, who in turn reported to Jacquelyn Boekel, Director of Imaging Services.

A.      *FMLA Leave*

SMMC provides FMLA leave for employees "with a minimum of one (1) year of service and [who] hav[e] 1250 hours of service in the prior 12 months." JA 6. Employees may take up to twelve months of leave for a "serious health condition which makes the [employee] unable to perform the job." *Id*. SMMC's policy concerning FMLA states that it offers "no guarantee of any particular position" to employees who take leave. JA 7. However, "SMMC will assist [an employee] in attaining an equivalent position for which they are qualified when returning from an FMLA [leave of absence]." *Id*. SMMC's policies outline the procedure for requesting leave and returning to work. In particular, the policy states:

> The [employee] must initiate all action for reinstatement when returning from FMLA. In the case of birth or [employee] illness, the [employee] must provide medical clearance to Human Resources prior to return to work by way of a letter for their physician stating that they are able to return full duty without restrictions.

JA 9 (emphasis removed).

In October 2012, Plaintiff injured her back and was diagnosed as having a herniated disk. JA 119-20. On October 9, 2012, Plaintiff applied for FMLA leave and her physician, Dr. Keith Sadel, signed a note stating that she was suffering from "severe low back pain" and that she would be "unable to return to work until treatment and diagnosis is complete." JA 20-21. In connection with taking FMLA leave, Plaintiff signed a document stating that she received information concerning SMMC's FMLA policies and the procedure for returning to work. JA 17. Plaintiff further signed an acknowledgement of SMMC's policies concerning a leave of absence, which included the statement:

2

> I UNDERSTAND THAT MY POSITION WILL NOT BE HELD BEYOND 12
> WEEKS OF LEAVE AND THAT I MUST PROVIDE MEDICAL
> CLEARANCE TO HUMAN RESOURCES PRIOR TO RETURNING TO
> WORK.  IF APPLICABLE, EXPECTED DURATION AND NATURE OF
> WORK RESTRICTIONS MUST BE SPECIFIED BY MY PHYSICIAN WHICH
> WILL BE REVIWED [BY] HUMAN RESOURCES TO DETERMINE IF
> ACCOMODATIONS CAN BE MADE.

JA 21 (caps in original).

On October 12, 2012, SMMC sent Plaintiff a letter stating: "Per [SMMC] Policy and the Family and Medical Leave of Absence Act, your Medical Leave of Absence is approved beginning October 10, 2012 and expires on January 2, 2013.  Your position is not guaranteed beyond that date.  You must be medically cleared and provide medical certification to Human Resources prior to returning to work."  JA 16 (emphasis removed); *see also* JA 121-22.

On December 18, 2012, Plaintiff was examined by Dr. Keith E. Sadel to determine her ability to perform her work functions.  Plaintiff testified that she "discussed with him [her] concerns about doing high volume of scans and the fear that [she] had that [she] would be reinjured."  JA 133.  Plaintiff further testified that Dr. Sadel "agreed with me that, you know, probably doing high volume scans is not good for me at this stage in my life."  *Id*.  Therefore, Plaintiff submitted paperwork stating that she was able to return to work with an accommodation that allowed her to perform a maximum of twelve ultrasounds per day, rather than her usual fifteen to twenty-five.  JA 19.  Plaintiff testified that later on December 18, 2012, she presented Dr. Sadel's letter to Maurizi, who stated that he did not know if he could accommodate the request but that he would get back to her.  JA 134.

SMMC did not respond to Plaintiff's request prior to the end of her FMLA leave.  On December 19, 2012, SMMC sent Plaintiff a letter stating:

> Your [FMLA] is scheduled to expire on January 2, 2013.  In order to be restored
> to employment a fitness-for-duty certificate must be presented to Human

Resources prior to your return to work.  If applicable, expected duration and nature of work restrictions must be specified by your attending physician; Human Resources will review and determine if reasonable accommodations can be made.

JA 15.  The letter concluded: "Your position will not be held beyond January 2, 2013."  *Id.*

Maurizi, Plaintiff's supervisor, testified that on December 30, 2012, Plaintiff called him to discuss her plans to return to work, "how she felt physically[,] and [how] . . . it was affecting her emotionally."  JA 213-14.  Plaintiff specifically talked, among other things, about "maybe leaving the profession" or "maybe going to an out patient ultrasound facility where she would not have to lift, push, drag patients."  *Id.*  Maurizi testified that he told her that she had to be the one to decide if it was time to leave the profession.  Maurizi stated:

> She was worried about her FMLA.  I told her that was an HR issue, between her and HR; that she was supposed to return at the end of her leave, which would have been January 2nd.  She asked me, you know, if I could accommodate her [request to perform 12 scans per day], and I said, No, we couldn't.  That the FMLA was all HR related. I couldn't speak to that.

JA 214.

On January 2, 2013, Plaintiff's FMLA leave ran out.  Because she had not heard back from Maurizi, Plaintiff went to SMMC's Human Resources department and presented Dr. Sadel's note to SMMC employee Carlin Sibel.  JA 135.  When Sibel informed Plaintiff that the decision was "up to the department managers," Plaintiff stated that she had already given Dr. Sadel's note to Maurizi but had not heard back from him.  *Id.*  Plaintiff recalls that Sibel told her she would follow up with Plaintiff's supervisors; however, at no point prior to January 2, 2013 did anyone from SMMC discuss with her whether they could comply with her requested accommodation or to discuss alternative options.  *Id.* ("Nobody called me and said, no, we definitely cannot do this.").  Plaintiff did not return to work on January 2, 2013.

On January 7, 2013, Jim Watson, another SMMC employee in the Ultrasound Department, informed Plaintiff that they would not accommodate her and that she was

4

terminated.  *Id*.  At her deposition, Boeckel, the director of Imaging Services, testified that

Plaintiff was terminated because "[s]he did not come back from her family medical leave.  She

presented with a doctor's note that . . . she could come back and do 12 scans and our department

doesn't work that way.  We couldn't accommodate 12 scans."  JA 242.

On January 8, SMMC sent Plaintiff a letter stating that her FMLA had expired on

January 2, 2013 and that "[t]he purpose of this letter is to notify you that [SMMC] is unable to

hold your position beyond January 2, 2013."  JA 14.  The letter continued:

> Since you were unable to return to work by January 2, 2013, you will remain on
> [SMMC]'s payroll and benefits roster until you are no longer disabled or have exhausted
> your short term disability benefit at which time you will be given 30 days [sic] notice to
> provide medical clearance and to find an available position at [SMMC] for which you
> qualify.

*Id.*  That same day Maurizi submitted a Productivity Request Form in which he requested to split

the hours from Plaintiff's previous position into two part-time positions, JA 13, 217, a request

which SMMC approved.  Maurizi testified that the motivation behind the split was to address

"the greatest need" within the department and to accommodate SMMC's "zero overtime policy;"

he reasoned that if the position were split, each employee could work up to forty hours per week

"without getting into overtime."  JA 217.  On January 8, 2013, SMMC internally posted the two

part-time positions.  JA 31.

On January 14, 2013, Plaintiff obtained a note from Dr. Sadel stating that she in fact

could perform her previous work duties without restrictions.  JA 18.  Plaintiff testified that she

took this note to Watson, who informed her that her position was no longer available.  JA 138.

Plaintiff then spoke with Boeckel, who also told her that her job was no longer available but that

she could apply and interview for one of the new part-time positions.  *Id*.  On January 16, 2013,

Plaintiff formally applied for a new part-time position, JA 10, and on January 20, 2013, SMMC

offered her the position.  JA 11.

**B.**   *Return to Work*

On Plaintiff's first day back at work, Maurizi told Plaintiff that he did not want her to overexert herself and that she should let him know if she had any issues.  JA 99, 149, 161.  In particular, Plaintiff testified that Maurizio asked if she would be able to "handle the work" and that he didn't want her to "do too much."  JA 161-62.  Plaintiff testified that she perceived these comments as condescending.  JA 99.  In addition, Plaintiff testified that she felt "shunned and avoided" by Maurizi and Boekel in the period following her return to work.  JA 148.  In short, Plaintiff felt as though "they did not want [her] there."  JA 99.

In March 2013, SMMC proposed an opening for a new full-time ultrasound technician.  JA 130.  The proposed position specifically focused on providing "comprehensive care to patients requiring Vascular and TransCranial Doppler Ultrasound services."  JA 53-68.  Plaintiff believed she was not qualified to apply for this position because she had not performed a Trans Cranial Doppler ultrasound in the past eight months.  JA 130.

On March 6, 2013, Plaintiff met with SMMC's "Care Bridge" program, which provides psychological counseling, in order to address anxiety and depression she felt due to her treatment at work.  JA 166.  Plaintiff's client file notes from her Care Bridge visits indicate that she expressed feeling "retaliated against by work."  JA 335.  The notes additionally state that Plaintiff "feels betrayed by her employers and can not accept what feels like prejudicial treatment.  Her security is very threatened and she feels like she has no support.  Depressed and discouraged."  JA 336.  The record shows that Plaintiff contacted the Care Bridge program several times throughout the month.  JA 335-37.

In April 2013, Plaintiff reinjured her back.  JA 22.  As a result of her condition, Plaintiff was unable to work even in a light duty capacity.  JA 90-91.  On April 26, Maurizi requested

Plaintiff's termination stating that she "last worked April 1, 2013 and I have not been contacted or notified of any date to return to work.  The Ultrasound department can no longer support this vacant position."  *Id*.

## II.   LEGAL STANDARD

"[S]ummary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (citations and internal quotation marks omitted).  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof."  *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52).  A fact is material if it might affect the outcome of the suit under the governing law.  *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006).  "The reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor."  *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013).  However, to prevail on a motion for summary judgment, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-movant].'"  *Jakimas v. Hoffmann-La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007) (quoting *Anderson*, 477 U.S. at 252) (alteration in *Jakimas*).  In other words, "[t]he non-moving

party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Abington Friends Sch.*, 480 F.3d at 256 (citing *Celotex*, 477 U.S. at 322-26).

## III.   DISCUSSION

### A.   *Legal Framework*

The Third Circuit analyzes ADA, PHRA, and FMLA discrimination and retaliation claims under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973).  *See Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000); *Parker v. Verizon Pa. Inc*., 309 F. App'x 551, 555 (3d Cir. 2009).  Under that framework, the plaintiff must first establish a *prima facie* case of discrimination.  If the plaintiff succeeds in doing so, the burden of production shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802.  Finally, if the defendant carries its burden, the plaintiff has the opportunity to prove that the reasons offered by the defendant were not its true reasons, but rather a pretext for discrimination.  *Shaner*, 204 F.3d at 500.  Here, SMMC argues that Plaintiff has failed to establish a *prima facie* case for discrimination and retaliation, and that Plaintiff has failed to establish that SMMC's proferred non-discriminatory reasons for its conduct are a pretext for unlawful discrimination or retaliation. Mot. at 7, 25.

### B.   *Prima Facie Case: ADA / PHRA*

To establish a *prima facie* case of disability discrimination under the ADA and PHRA, Plaintiff must show that she: (1) "has a disability"; (2) is a "qualified individual"; and (3) "has suffered an adverse employment action because of that disability." *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 611 (3d Cir. 2006).  SMMC disputes the first and third elements, *i.e*., that

Plaintiff had a disability and that she suffered an adverse employment action because of that disability.

### 1.    Disability Determination

To be "disabled" under the ADA and the PHRA, a plaintiff must prove: (1) an actual "mental or physical impairment that substantially limits one or more major life activities"; (2) a "record of such an impairment;" or, (3) that she is "regarded as having such an impairment."  42 U.S.C. § 12102(1).  Plaintiff raises both actual disability and "regarded as" disability.

As a preliminary issue, the Court must analyze Plaintiff's disability discrimination claims under ADA and PHRA under two different frameworks.  Although courts have traditionally evaluated whether a plaintiff has established a disability under the ADA and PHRA coextensively, *see Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996), Congress substantially modified the ADA in 2008 via the ADA Amendments Act ("ADAAA").  While the ADAAA substantially lowered the standard for finding a disability under the ADA, the PHRA has not been similarly amended.  *Szarawara v. Cnty. of Montgomery*, No. 12-5714, 2013 WL 3230691, *2 (E.D. Pa. June 27, 2013) ("[T]he PHRA has not been similarly amended, necessitating separate analysis of Plaintiff's ADA and PHRA claims.").  Accordingly, the Court separately analyzes the sufficiency of the evidence with respect to Plaintiff's alleged disability for her ADA and her PHRA claims.

### a.    *Actual Disability*

### i.  ADAAA

To prevail on an actual disability claim under the ADA, Plaintiff must "establish that she has an impairment; identify the life activity that she claims is limited by the impairment; and prove that the limitation is substantial."  *Cunningham v. Novo Nordisk*, No. 12-6654, 2014 WL 1318390, at *4 (E.D. Pa. Apr. 1, 2014), *aff'd*, 615 F. App'x 97 (3d Cir. 2015).  "Major life

9

activities" include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A). Whether an individual is substantially limited in performing a major life activity is a question of fact.  *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 763 (3d Cir. 2004).  Under the post-ADAAA EEOC regulations, however, the inquiry into substantial limitation need not demand "extensive analysis."  29 C.F.R. § 1630.2(j)(1)(ii).  Although the regulations provide that "not every impairment will constitute a disability within the meaning of [the ADA]," the ADAAA was enacted to clarify that the definition of "disability" should be construed "in broad favor of coverage of individuals . . . to the maximum extent permitted."  *Matthews v. Pennsylvania Dep't of Corrections*, 613 F. App'x 163, 167 (3d Cir. 2015) (citing 42 U.S.C. § 12102(4)(A)).  Therefore, courts must interpret the term "substantially limits" consistently with the liberalized purposes of the ADAAA.  *Id.* (citing 42 U.S.C. § 12102(4)(B)).

Plaintiff claims that due to a herniated disc, among other issues, she was substantially limited in the major life activities of bending, lifting, walking, leaning, sitting down and standing for prolonged periods of time, and working.  Opp'n at 13.  SMMC does not dispute for purposes of its motion that Plaintiff suffered an impairment or that she has identified issues with numerous major life activities under the ADA.  Rather, it argues that there is no evidence that Plaintiff was "substantially limited in any major life activity at the time [SMMC] allegedly engaged in the conduct she claims was discriminatory," *i.e.*, January 2013.  Mot. at 8; Reply at 3.  In particular, SMMC points to Plaintiff's testimony that she had no physical restrictions or limitations as of December 18, 2012 that prevented her from being able to perform her job duties.  *See* JA 133 (Q: "Did you have any physical restrictions or limitation as of December 19, 2012 that would have

prevented you from being able to perform the duties of an ultrasound technician at [SMMC]?" A: "No."). SMMC further points to Plaintiff's deposition testimony indicating that her physical condition had not changed from December 19, 2012 to April 1, 2013, at which time her employment at SMMC came to an end. Mot. at 9; JA 138 (Q: "Had your physical condition changed at all from . . . December 18, 2012 to January 14th, 2013?" A: No."). SMMC argues that in light of this admission, "no reasonable jury could conclude that Lindsey was substantially limited" in performing the functions of her job between December 18, 2012 and April 1, 2013, when the complained of conduct occurred. Mot. at 9; Reply at 4.

However, in determining whether Plaintiff qualifies as disabled under the ADA, the issue is not whether Plaintiff could perform the functions of her job, but whether Plaintiff suffered from an impairment that substantially limited a major life activity. Here, the record contains sufficient evidence that Plaintiff's back and shoulder pain has been ongoing and chronic in nature. Plaintiff points to testimony from her deposition in which she described the "current symptoms" she suffers due to her chronic back pain. Mot. at 3 (citing JA 97, 316, 319). In particular, Plaintiff testified that she has "pain in the low back," "sciatica down the right leg," "bilateral hand pain, trouble grasping, gripping especially small objects," and "with regards to the shoulder . . . difficulty with abduction." JA 97. In addition, Plaintiff testified that she has "difficulty bending, standing for prolonged periods, sitting for prolonged periods, [and] lifting" anything above ten pounds." *Id*. Although these statements describe her current pain, and not the pain she experienced at the time of the alleged discrimination, Plaintiff argues that her chronic back pain and shoulder injuries "have been present since at least August of 2010," Opp'n

11

at 3, and directs the Court to a medical note typed by Dr. Sadel on August 25, 2010.[1]  JA 340.  In

full, the note reads:

> [Plaintiff] is here today for prescription renewal.  She is still having chronic pain
> to Rt. Shoulder and upper back pain. She does gets [sic] massages every other
> week and it has been very helpful.  At times she puts excessive weight on her
> shoulders and back, being a U/S tech. in hospital and constantly using her upper
> body.  She has tried heat and ice to the shoulders and back with some relief, but
> the pain medication relieves it the best. She takes 1-1/2 Vicodin prn with good
> relief.  She denies any chest pain, SOB, H/A, or dizziness.  She has been
> experiencing some anxiety with her work and has found it difficult at times to
> manage the stress.  Sometimes her sleep is affected by the stress.

JA 340.

In light of the ADAAA's liberalized definition of "disability," Plaintiff has offered

sufficient evidence to raise a genuine issue of fact as to whether she had a disability during the

relevant period.

### ii.  PHRA

As with a claim for discrimination under the ADA, a plaintiff alleging discrimination

under the PHRA must show that she is more than merely impaired; she must demonstrate: (1) an

actual mental or physical impairment that substantially limits one or more major life activities; (2)

a record of such impairment; or (3) that her employer regarded her as having a disability.

*Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 274 (3d Cir. 2012).  The term "substantially" in

the phrase "substantially limits" suggests "considerable" or "to a large degree."  *Colwell v. Rite*

---

[1]    Although SMMC argues that Plaintiff's chronic injury is insufficient to establish a disability due to Plaintiff's
statement at her deposition that she experienced pain only "at times," Mot. at 8, the amendments to the ADA make
clear that a plaintiff can be disabled even if she has a medical condition that is temporary or episodic in nature.  29
C.F.R. § 1630.  In any event, Plaintiff has pointed to Dr. Sadel's note from December 18 indicating that she needed
an accommodation during the relevant time period due to her "chronic cervical and shoulder pain."  JA 19.
Similarly, SMMC's argument that Plaintiff cannot establish she was disabled because she in fact performed her job
duties as a part-time technician in January 2013 is also unpersuasive.  *See* Mot. at 10.  Indeed, in order to qualify for
the protections afforded by the ADA, an individual must show that she is one "who, with or without reasonable
accommodation, can perform the essential functions of the employment position that [she] holds or desires."  42
U.S.C. § 12111(8).  Thus, the fact that Plaintiff testified that she was able to perform the same number of scans that
she performed prior to her FMLA leave on a part-time basis, *see* JA 147, does not preclude a finding that Plaintiff
was disabled at the time she performed those scans.

*Aid Corp.*, 602 F.3d 495, 502 (3d Cir. 2010) (quoting *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 197 (2002)).  As a result, an impairment is considered substantially limiting only if the plaintiff is: (1) *unable* to perform a major life activity that the average person in the general population can perform; or (2) *significantly restricted* as to the condition, manner, and duration under which [she] can perform a particular major life activity as compared to the condition, manner, and duration under which the average person in the general population can perform that same major life activity.  *Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 782-83 (3d Cir. 1998) (citing pre-ADAAA EEOC regulation 29 C.F.R. § 1630.2(j)(1)(i)-(ii)).) In making this determination, courts should consider: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact of or resulting from the impairment.  *Id.* at 783 (quoting pre-ADAAA EEOC regulation 29 C.F.R. § 1630.2(j)(2)(i)-(iii)) (internal quotations omitted).

Plaintiff argues that "[i]n October of 2012, [her] doctor determined that she was unable to engage in the major life activity of working."  *Id.*[2]  And, the record does indeed contain sufficient evidence from which a jury could conclude that Plaintiff was significantly restricted as to the major life activity of working.  In determining whether an individual is substantially limited in her ability to work, the proper inquiry is whether she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities."  *Mondzelewski*, 162 F.3d at 783-84.

The record indicates that in October 2012, Plaintiff was diagnosed with a herniated disc. *See, e.g.*, JA 120, 307.  On October 11, 2012, Dr. Sadel, at Plaintiff's request, filled out a form

---

[2]    Plaintiff also argues that she is substantially restricted in performing the major life activities of bending, lifting, walking, leaning, sitting down, and standing for prolonged periods of time.  Opp'n at 13.  Given the Court's holding with respect to restrictions on her ability to work, the Court does not reach these arguments.

stating that Plaintiff was unable to work due to her condition.  JA 327-29.  When asked at his

deposition to explain the basis for this decision, Dr. Sadel stated, in essence, that he would fill

out the form in accordance with the patient's wishes.  He explained:

> Most people want to go back to work, you know, so it's --- you know, if she had
> to take off for the diagnosis phases, then I try to – you know, I mean, I fill out a
> lot of these things, so people, you know, they want to make sure their job is still
> around, so I'm assuming that's why these are around.

JA 305.  Dr. Sadel testified that it is "hard to say" whether someone with Plaintiff's condition

would be able to work as "some people can have herniated discs and work fine," but that

"[Plaintiff] clearly had pain associated with it."  JA 307.

During her FMLA leave, Plaintiff underwent physical therapy at SMMC and received

two epidural injections in November and December of 2012.  JA 287, 324.  On December 18,

2012, Dr. Sadel re-examined Plaintiff.  His patient notes from that visit indicate that Plaintiff was

"still having pain and also upper c spine and shoulder pain."  *Id.*  In addition, the notes state that

Plaintiff informed Dr. Sadel that "she has to do 20 ultrasounds a day and [is] unsure if she can do

[them]," that she is "*physically unable to return to work*," but that "wants to go back and may be

able to go on 1/2 schedule."  *Id* (emphasis added).  Dr. Sadel further testified that shortly after

Plaintiff's visit, he filled out a disability form for her.  JA. 309.  Based on his discussion with

Plaintiff, Dr. Sadel wrote that she was presently unable to return to work, but that she would be

able to perform twelve scans per day after December 31, 2012.  JA 310.  When asked how he

arrived at that number, Dr. Sadel stated that he, again, deferred to Plaintiff's wishes and assumed

she thought she would be able to perform her job duties following her second epidural.  *Id.* ("We

probably talked about it and she thought, you know, this is what she could do.").

Defense counsel questioned Dr. Sadel extensively concerning whether Plaintiff had any

physical limitations at that point in time.  Dr. Sadel responded:

Yeah.  I mean, if she – I don't recall offhand, but if she had a herniated disc, you know, and she was having pain especially from what was shown on that MRI, I think it's pretty – it's definitely variable, but I've seen people – I've seen grown men cry from herniated discs, you know, just because of that burning pain that it causes on that nerve root.  So, you know, it's pretty uncomfortable. . . .  If I look at the note . . . it says here she had an epidural of her LS spine – or L spine on December 7th.  She's due for another on the 20th.  That's probably why – because this was on the 18th, so that's why we wanted to see how it would work. . . .  ***I'm assuming she probably had [a] physical limitation that prevented her from going full time***.

JA 310-11 (emphasis added).  When pressed on whether he believed Plaintiff could have

fulfilled the functions of her job, Dr. Sadel stated that he "just can't say for sure," but added the

following:

Well, I wrote here, it said – you know, this is what she told me that she states she's unable to do 20 ultrasounds and unsure if she can do it.  She's physically unable to return to work and wants to go back to work.  I mean I don't know why I would dispute that.  I mean, you know, she came in, she has a herniated disc, you know.  So I would say that it's just what I wrote; that you know – you know, I mean, some people – I mean, ***I can say some people wouldn't even want to get back to work with that***, so I couldn't tell you for sure.  I just don't recall exactly how things were at that time. . . .  ***I would say with a herniated disc and the amount of pain that she had, you know, causing her to get two epidurals, I would say she's probably in a lot of pain***. . . .  You know, pain is very subjective, you know, so if somebody just physically can't do something because they're in that much pain, I mean, it's very hard to measure.

JA 311-12 (emphasis added).  As for Plaintiff's January 14, 2013 request for another note stating

that she was cleared to return to work full-time, Dr. Sadel stated that "she probably wanted to go

back to work, and she had an epidural at that point, which was the second one, so she probably

thought she was okay to go back to work."  JA 313.  The record further reflects that in July 2013,

after Plaintiff reinjured her back while working part-time and underwent surgery, Dr. Sadel

concluded that she was "medically unable to work in her profession or any other profession."  JA

316.  Dr. Sadel testified that this conclusion was based on her "depression and . . . persistent

pain."  *Id.*

15

Taken in the light most favorable to Plaintiff, Dr. Sadel's notes and testimony sufficiently raise a material issue as to whether Plaintiff was significantly restricted during the relevant time period in her ability to perform not just her own job as an ultrasound technician, but a broad range of jobs in various classes.  As of December 18, 2012, both Plaintiff and Dr. Sadel concluded that she was "physically unable" to return to work.  Despite this conclusion, Dr. Sadel was comfortable writing that Plaintiff could return to work with a restriction of twelve scans per day based on Plaintiff's own statements about her own pain tolerance level and the predicted benefit of a second epidural.  A reasonable jury could conclude that Plaintiff's optimism about returning to work – both with and without restrictions – was not based on an actual assessment of her physical condition but simply reflected a desire, as Dr. Sadel explained is frequently the case, to remain employed.  Moreover, even though Plaintiff testified that she was in fact capable of performing her job functions during the January 2013 through April 2013 period, a jury could conclude from Plaintiff's reported pain levels during that time, re-injury, and subsequent disability just three months after returning to a part-time position that Plaintiff was in fact severely restricted in her ability to work even at the time SMMC decided to eliminate her position.  Accordingly, the Court concludes that Plaintiff has established facts that raise a material issue as to whether she is disabled under the PHRA.[3]

## 2.    Adverse Employment Action

Having concluded that Plaintiff has established that she was disabled under the ADA, PHRA, and FMLA the Court next examines whether she has established sufficient facts in support of the third element of her *prima facie* case, *i.e.*, that she suffered an adverse

---

[3]    Having concluded that Plaintiff has established an actual disability under the ADAAA and PHRA during the relevant period, the Court need not analyze whether Plaintiff has also established that she was "regarded as" disabled.

employment action as a result of disability.  To meet the standard, Plaintiff must show that her disability was a "determinative factor" in SMMC's decisions to take adverse employment actions.  *Decker v. Alliant Techs.*, LLC, 871 F. Supp. 2d 413, 428 (E.D. Pa. 2012) (citing *Watson v. SEPTA*, 207 F.3d 207, 214-15 (3d Cir. 2000)).  An adverse employment action is one that is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."  *Cunningham*, 615 F. App'x at 100 (quoting *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)).  A demotion from full-time to part-time employment can constitute an adverse employment action under Third Circuit precedent.  *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 411-12 (3d Cir. 1999) ("We have held that employment decisions such as transfers and demotions may suffice to establish the third element of a plaintiff's prima facie case."); *Wilson v. Checkers Drive-In Restaurants, Inc.,* No. 12-5365, 2013 WL 2256133, at *5 (E.D. Pa. May 23, 2013) (citation omitted) ("A reduction of hours . . . would qualify as an adverse employment action as it could deprive that plaintiff of employment opportunities or affect her status as an employee.").  Plaintiff has further adduced evidence that her disability was the "determinative factor" in SMMC's decision to eliminate her job.  Opp'n at 15.  In particular, Plaintiff points to record evidence in which Boekel admitted that Plaintiff was terminated because "she did not come back from her family medical leave" and SMMC "couldn't accommodate her."  *Id.*; JA 242.  Accordingly, Plaintiff has satisfied her burden to establish an adverse employment action due to her disability and, thus, Plaintiff has established her *prima facie* case for disability discrimination under the ADA.[4]

---

[4]    In its motion, SMMC argues that various other issues raised in the Second Amended Complaint are not adverse employment actions.  Specifically, SMMC points to Plaintiff's allegations that she was "faced with hostility and animosity, as Defendant reduced her hours in half, questioned her about her back condition, and offered additional shifts to other technicians before her."  Mot. at 14.  In addition, SMMC addresses Plaintiff's allegations that SMMC discriminated and/or retaliated against her by creating a full-time position for which she believed she was not

### C.  *Prima Facie Case: ADA, PHRA, FMLA Retaliation*

In her retaliation claims, Plaintiff alleges that after requesting a reasonable accommodation, SMMC retaliated against her by demoting her to a part-time position.  *See* SAC ¶ 38.  In order to establish a *prima facie* case of illegal retaliation under the ADA, PHRA, and FMLA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.  *Williams*, 380 F.3d at 759; *Conoshenti v. Pub. Serv. Elec. & Gas Co.,* 364 F.3d 135, 146 (3d Cir. 2004).

### 1.  Protected Activity

SMMC concedes for purposes of its motion that Plaintiff has engaged in a protected activity with respect to her FMLA claim.  Mot. at 25.  With respect to her ADA and PHRA claims, however, SMMC argues that Plaintiff failed to meet her burden.  Mot. at 25-26.  Although a viable retaliation claim does not require "the demonstration of a disability under the ADA," an employee seeking to advance such a claim must have "a reasonable good faith belief that [she] was entitled to request the reasonable accommodation she requested."  *Rumanek v. Indep. Sch. Mgmt., Inc.*, 619 F. App'x 71, 76 (3d Cir. 2015), *cert. denied*, 136 S. Ct. 847 (2016).  SMMC argues that, given Plaintiff's deposition testimony that she had "no physical restrictions or limitations that would have prevented her from doing her job at the time she asked for restricted duty work," she did not request an accommodation in good faith.  Mot. at 25-26.

---

qualified.  *Id*.  In her opposing memorandum, however, Plaintiff did not address Defendant's arguments concerning either of these points and identifies the sole adverse employment action as SMMC's alleged "demotion" of Plaintiff to a part-time position after eliminating her full-time position in January 2013.  Opp'n at 15.  Accordingly, the only adverse action at issue that is addressed in this motion for summary judgment is Plaintiff's "demotion" to a part-time position following the end of her FMLA.

In response, Plaintiff argues that she had a good-faith basis for requesting to perform a reduced number of scans per day because her October 2012 back injury was caused by the extensive number of scans she had been performing as a full-time technician.  Opp'n at 19 (citing JA 119).  Plaintiff further points to evidence that, following her FMLA leave, Dr. Sadel believed that a higher number of scans was "not a good thing for [Plaintiff]" at the time she submitted the requested accommodation.  *Id*.  Although SMMC is correct that Plaintiff later testified that she was physically capable of performing all her job functions, that fact does not negate the record evidence that by doing so, Plaintiff suffered extreme pain that prevented her from bending, leaning, walking, sitting, and working.  JA 19.  Interpreting the evidence in the light most favorable to Plaintiff, a reasonable fact-finder could conclude that Plaintiff had a good faith basis to request an accommodation and that her later statements that she was able to work without restrictions were made in an effort to keep her job once SMMC advised her that they could not accommodate her request.  Accordingly, the Court finds that Plaintiff has met her burden with respect to the first element of her *prima facie* case for retaliation.

### 2.  Adverse Employment Action

As discussed in Section III(B)(2) above, Plaintiff has met her burden to show that she suffered from an adverse employment action, *i.e*., a "demotion" to a part-time position, as a result of her request for an accommodation.

### 3.  Causal Connection

To establish the third prong of her retaliation claims, Plaintiff must show that that her disability was a "determinative factor" in SMMC's adverse employment action.  *Watson*, 207 F.3d at 214-15.  SMMC argues that Plaintiff has failed to meet this burden because there is no evidence that any action was taken because of Plaintiff's disability.  Mot. at 27.  However, as discussed in Section III(B)(2) above, the record reflects that SMMC eliminated Plaintiff's job

and required her to apply for a part-time position *because* she requested an accommodation and did not return to work without limitations prior to the end of her FMLA leave.  Moreover, as discussed further below, Plaintiff has raised a genuine issue of material fact as to whether SMMC deliberately failed to inform Plaintiff prior to the end of her FMLA leave that her only option to retain her position was to return without restrictions.  *See* Opp'n at 23-24.[5]  Interpreting the evidence in the light most favorable to Plaintiff, the Court concludes that Plaintiff has successfully established a *prima facie* case for retaliation under the ADA and PHRA.[6]

### D.   *Employer's Non-Discriminatory Reason*

Because Plaintiff has met her *prima facie* burden for her ADA, PHRA and FMLA claims, the burden then shifts to SMMC to show that there was a legitimate, nondiscriminatory reason for Plaintiff's termination.  "An employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a reason that was not discriminatory for the adverse employment decision."  *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)).

SMMC offers justifications for two separate acts: (1) eliminating Plaintiff's full-time position prior to informing Plaintiff that her requested restrictions could not be accommodated; and, (2) splitting Plaintiff's full-time position into two part-time positions.  With respect to the first act, SMMC contends that it only eliminated Plaintiff's position after she failed to return to

---

[5]    In addition, Plaintiff argues that causation can be inferred due to the unusually suggestive timing of her termination (*i.e.*, the elimination of her full-time position three weeks after she presented Dr. Sadel's note requesting an accommodation) and a pattern of antagonism.  *See* Opp'n at 21-23.  Having already concluded that Plaintiff has established a genuine issue of material fact that her disability was the motivating factor behind her "demotion," the Court need not address these additional arguments.

[6]    SMMC argues that Plaintiff must establish "but for" causation with respect to her retaliation claims.  Mot. at 25.  Although Plaintiff does not directly respond to this argument in her opposing memorandum, as described above, Plaintiff has pointed to evidence from which a reasonable jury could conclude that SMMC would not have failed to respond to her request for accommodation prior to the end of her FMLA leave or eliminated her position but for the fact that SMMC viewed Plaintiff as unable to fulfill her full-time job functions due to her disability.

work without restrictions before the expiration of her FMLA leave.  Mot. at 19.  SMMC points to evidence that Plaintiff was advised of and understood her obligation to return to work on or before January 2, 2013, including a signed confirmation that informed Plaintiff that her job would not be guaranteed if she did not return to work before the end of her leave without restrictions.  *Id.* (citing JA 17, 20-21, 121).  In addition, SMMC points to the fact that Plaintiff's supervisors did not submit an administrative request to effectuate their decision to split Plaintiff's position into two part-time positions until January 8, 2013, five days after Plaintiff's job protection expired.  *Id.* at 20.

With respect to the second act, *i.e.*, splitting Plaintiff's full-time position into two part-time positions, SMMC argues that it split Plaintiff's position into two in order "to fill a long-standing coverage gap on the second shift."  *Id.* at 20.  SMMC offers further evidence that full-time positions are regularly modified or split apart to meet business needs, and that SMMC has taken such action with respect to ultrasound technicians who both took and did not take FMLA leave.  *Id.* at 23 (citing JA 343-46).

### E.    *Pretext*

To defeat a motion for summary judgment where a defendant has offered a legitimate, non-discriminatory reason for an adverse employment action, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Fuentes*, 32 F.3d at 764.  To discredit the employer's articulated reasons, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken."  *Id.* at 765.  "Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Id.* (citation omitted).  The plaintiff must show by a preponderance of the evidence "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Keller v. Orix Cred. Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997).

To contradict SMMC's stated reason for eliminating Plaintiff's job position, *i.e.*, that Plaintiff had failed to return to work without limitation prior to the end of her FMLA leave, Plaintiff argues that even though SMMC had received Plaintiff's request for an accommodation as early as December 18, 2012, Plaintiff was not contacted by SMMC about her accommodation request in advance of the January 2, 2013 deadline.  On December 30, 2012, Plaintiff spoke with Maurizi about the possibility of returning.  Although Maurizi testified that he told Plaintiff she could not perform only twelve scans per day, Maurizi admitted that he never informed Plaintiff that if she did *not* agree to do more she would not have a job to return to.  JA 214-15.  Moreover, Plaintiff testified that "nobody called [her] to discuss whether [SMMC] can make the accommodations [or] whether there [were] any other options" until after her FMLA had lapsed. JA 135.  As set forth above, on January, 2, 2013, Plaintiff returned to work to inquire about the status of her job and was told by Sibel in Human Resources that she would speak with Plaintiff's supervisors about the request for accommodation.  Opp'n at 23; JA 139.  The next conversation Plaintiff had with SMMC was on January 7, 2013, when Plaintiff was told that her position was no longer available.

SMMC argues that Plaintiff should have been aware that she needed to return to work without restrictions before the end of her FMLA leave because she was provided information

concerning an SMMC policy which states that employees must provide medical clearance that they are able to return to work without restrictions before returning from extended leave.  JA 9. However, several official documents detailing SMMC's policies concerning FMLA leave take into account the possibility that an employee would request an accommodation.  Specifically, prior to taking her leave, Plaintiff signed a document in which she acknowledged SMMC's FMLA policy as follows:

> I UNDERSTAND THAT MY POSITION WILL NOT BE HELD BEYOND 12 WEEKS OF LEAVE AND THAT I MUST PROVIDE MEDICAL CLEARANCE TO HUMAN RESOURCES PRIOR TO RETURNING TO WORK.  **IF APPLICABLE, EXPECTED DURATION AND NATURE OF WORK RESTRICTIONS MUST BE SPECIFIED BY MY PHYSICIAN WHICH WILL BE REVIEWED [BY] HUMAN RESOURCES TO DETERMINE IF ACCOMODATIONS CAN BE MADE.**

JA 21 (emphasis added).  Plaintiff has pointed to record evidence that she obtained a note from Dr. Sadel that listed her expected work restrictions, and she expected to hear from Human Resources as to whether her requested accommodation could be made.  Indeed, one day after receiving Plaintiff's request for an accommodation, SMMC sent Plaintiff a letter, which stated:

> Your [FMLA] is scheduled to expire on January 2, 2013.  In order to be restored to employment a fitness-for-duty certificate must be presented to Human Resources prior to your return to work.  **If applicable, expected duration and nature of work restrictions must be specified by your attending physician; Human Resources will review and determine if reasonable accommodations can be made**.

JA 15 (emphasis added).  Rather than engage in a dialogue concerning whether the requested accommodation was reasonable, however, SMMC waited until the clock ran out on Plaintiff's FMLA leave, eliminated her job and only *then* contacted Plaintiff to inform her that her request had been denied.  According to deposition testimony from SMMC's Human Resources staffer, Sibel, SMMC employees are not automatically terminated if they fail to return from FMLA leave on time.  Opp'n at 25; JA 257.  Specifically, Sibel testified that a determination was made on a

case-by-case basis, and if the employee had spoken with someone in management and would return "in a few weeks," management can decide to hold the position.  Opp'n at 25.  Together, Plaintiff's evidence provides a basis from which a jury could reasonably conclude that SMMC led Plaintiff to believe that they would respond to her request for accommodation prior to eliminating her position.

Finally, Plaintiff's evidence that she experienced a pattern of antagonism after she returned to work part-time could suggest to a jury that SMMC failed to notify Plaintiff that they would not accommodate her request because of a discriminatory bias.  As discussed above, Plaintiff testified that she felt that Maurizio treated her in a condescending manner and that felt as though she were "shunned" and "avoided" by her supervisors.  Although Plaintiff's evidence on this point is sparse and self-serving, Plaintiff has produced notes from her meetings with SMMC's Care Bridge Program, which corroborate her testimony that she felt she was the victim of prejudicial treatment, that she felt "threatened," and that she had "no support."  JA 335-37.

Interpreting these facts in the light most favorable to Plaintiff, she has raised a material issue of fact as to whether SMMC opportunistically selected Plaintiff's full-time position as the vehicle to create two part-time positions because of Plaintiff's disability and request for accommodation.[7]  As such, the Court need not analyze whether SMMC's stated business reasons for splitting Plaintiff's position were also pretextual.  For even if SMMC in fact had a legitimate, non-discriminatory reason for splitting a full-time position in two, a jury could find that SMMC

---

[7]    SMMC argues that "[t]o the extent that [Plaintiff] claims that [SMMC] is liable to her in this matter because it did not respond to her request to work in a limited duty capacity before the expiration of her FMLA leave of absence," that claim fails because Plaintiff has withdrawn her failure to accommodate claims and thus, "in order to establish a viable claim" here, Plaintiff "must show that [SMMC's] conduct constituted either FMLA or ADA retaliation or some form of ADA discrimination other than a failure to accommodate."  Mot. at 29.  Here, the issue of SMMC's failure to respond to Lindsey prior to her FMLA leave is relevant to her discrimination and retaliation claims because it can be construed as evidence that SMMC intended to eliminate Plaintiff's position and force her into a part-time position because of her disability.

discriminated and/or retaliated against Plaintiff by selecting *her* position as the one to be split. Accordingly, SMMC's motion for summary judgment with respect to Plaintiff's retaliation claims is denied.

## IV.   CONCLUSION

For the foregoing reasons, SMMC's motion for summary judgment shall be **DENIED**. An appropriate order shall follow.

**BY THE COURT:**

**/S/WENDY BEETLESTONE, J.**

_____

**WENDY BEETLESTONE, J.**